**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. CORDAE L. BLACK, *Defendant-Appellant*. | No. 11-10036 D.C. No. 2:09-cr-01040-MHM-4 |

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. ANGEL MAHON, *Defendant-Appellant*. | No. 11-10037 D.C. No. 2:09-cr-01040-MHM-6 |

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. KEMFORD J. ALEXANDER, *Defendant-Appellant*. | No. 11-10039 D.C. No. 2:09-cr-01040-MHM-2 |

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

TERRANCE L. TIMMONS,
*Defendant-Appellant*.

No. 11-10077

D.C. No.
2:09-cr-01040-MHM-3

ORDER DENYING
PETITIONS FOR
PANEL REHEARING
AND PETITIONS FOR
REHEARING EN
BANC

Filed May 2, 2014

Before:  John T. Noonan, Jr., Susan P. Graber,
and Raymond C. Fisher, Circuit Judges.

Order;
Dissent by Judge Reinhardt

# SUMMARY[*]

## Criminal Law

The panel denied petitions for panel rehearing, and denied petitions for rehearing en banc on behalf of the court, in cases arising out of a reverse sting operation in which an ATF undercover agent recruited the defendants to carry out an armed robbery of a fictional cocaine stash house.

Judge Noonan voted to grant the petitions for panel rehearing and recommended granting the petitions for rehearing en banc.

Judge Reinhardt, joined by Chief Judge Kozinski, dissented from the denial of rehearing en banc. He wrote that the majority opinion sends a dangerous signal that courts will uphold law enforcement tactics even though their threat to values of equality, fairness, and liberty is unmistakable.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**ORDER**

Judge Noonan has voted to grant the petitions for panel rehearing and recommended granting the petitions for rehearing en banc. Judges Graber and Fisher have voted to deny the petitions for panel rehearing. Judge Graber has voted to deny the petitions for rehearing en banc and Judge Fisher has so recommended.

The full court was advised of the petitions for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35(f).

Appellant Cordae L. Black's petition for rehearing en banc (No. 11-10036), filed November 5, 2013, is **DENIED**.

Appellant Angel Mahon's petition for panel rehearing and rehearing en banc (No. 11-10037), filed January 6, 2014, is **DENIED**.

Appellant Kemford J. Alexander's petition for panel rehearing and rehearing en banc (No. 11-10039), filed January 6, 2014, is **DENIED**.

Appellant Terrance L. Timmons' petition for panel rehearing and rehearing en banc (No. 11-10077), filed November 6, 2013, is **DENIED**.

Judge Reinhardt's dissent from denial of rehearing en banc is filed concurrently with this Order.

Judge REINHARDT, with whom Chief Judge KOZINSKI joins, dissenting from the denial of rehearing en banc:

The *Black* cases arise from a profoundly disturbing use of government power that directly imperils some of our most fundamental constitutional values. An undercover government agent in Phoenix sent a paid confidential informant (CI) to randomly recruit "bad guys" in a "bad part of town" to help rob a non-existent stash house. While trolling in a bar, the paid CI successfully tempted a randomly-selected person to participate in the (fictional) crime by offering him the opportunity to obtain a huge financial benefit. After the CI put the participant in touch with the government agent, the agent urged the participant to bring others into the plot, played the principal role in devising and executing the imaginary crime, and then walked the defendants through a script that ensured lengthy prison sentences for committing a crime that did not exist.

The *Black* cases require us to address the limits on how our government may treat its citizens. They pose the question whether the government may target poor, minority neighborhoods and seek to tempt their residents to commit crimes that might well result in their escape from poverty. Equally important, these cases force us to consider the continued vitality of the outrageous government conduct doctrine itself. The majority opinion decides all of these issues incorrectly. Further, despite its claims to the contrary, the majority's reasoning does virtually nothing to caution the government about overreaching. Instead, it sends a dangerous signal that courts will uphold law enforcement tactics even though their threat to values of equality, fairness, and liberty is unmistakable. I therefore dissent from the court's decision not to rehear these cases en banc.

# I

The facts are undisputed. *See United States v. Black*, 733 F.3d 294, 297–301 (9th Cir. 2013). The government sent a paid CI to Phoenix with instructions to recruit random persons to help rob a non-existent cocaine stash house. Following orders, the CI went to bars in "a bad part of town" and looked for people who seemed to him like "bad guys." The CI had not been told to seek out people already engaged in criminal activity or even persons engaged in suspicious conduct. Rather, as instructed, he trolled for targets in bars and eventually encountered Shavor Simpson, who expressed a willingness to join in the robbery. The CI introduced Simpson to his handler, Agent Zayas, who posed as a disgruntled former drug courier. Simpson asserted that he had criminal experience and introduced Zayas to Cordae Black. Agent Zayas recruited Simpson and Black, fed them details about the imaginary target (including the number of kilos of cocaine to be found in the imaginary stash house), encouraged them to be sure to bring guns along while performing their government-created mission, and described "facts" regarding the stash house in order to convince Simpson to involve more people in their plan (this is how Defendants Alexander, Mahon, and Timmons got involved). Agent Zayas told the defendants when to meet and where to go. Black contributed to the planning of the offense, but the scheme was of the government's devising. When the defendants met with Agent Zayas in preparation for the robbery, he led them to a warehouse where they were arrested.

The entire operation was, of course, a fiction. Agent Zayas had created an elaborate crime-script and the defendants had followed it under his sustained and careful

supervision. All Agent Zayas had to do was send his CI to a "bad" part of town in search of "bad" guys, leaving the choice of targets entirely to his CI's prejudices and intuitions. Sure enough, after testing a number of people to see if they would be willing to commit a crime that would allow them to make a great deal of money, the CI had his first success. From there on the government's scheme proceeded as planned.

## II

The *Black* cases present important questions about our constitutional values. As we have long recognized, the Due Process Clause requires us to dismiss the indictment in "extreme cases in which the government's conduct violates fundamental fairness." *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011) (citation omitted). In other words, a conviction must fall where "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431–32 (1973). Here, the government's conduct ran afoul of several fundamental constitutional principles and, thus, the convictions cannot stand.

One of the most serious problems with the law enforcement tactics used in the *Black* cases is that they present a direct threat to the fundamental principle of racial equality. It is deeply disturbing that Agent Zayas sent his paid CI to look for "bad guys" in a "bad part of town," i.e. in a minority neighborhood. In an age of widely-reported unequal enforcement of the criminal laws, both at the state and federal levels, the sort of assignment given to the CI is an open invitation to racial discrimination—especially given the complete absence of any effort by Agent Zayas to aim the

operation at known or suspected criminals.[1] *See, e.g.*, *Floyd v. City of New York*, 959 F. Supp. 2d 540, 560 (S.D.N.Y. 2013), *appeal dismissed* (Sept. 25, 2013) (Scheindlin, J.) (finding discriminatory enforcement by police of stop and frisk policies in New York City); Michelle Alexander, *The New Jim Crow: Mass Incarceration in an Age of Colorblindness* 9 (2010); Bruce Western, *Punishment and Inequality in America* 3 (2006). The manifest danger of racial discrimination inherent in the law enforcement tactics used here is an important part of why "random," suspicionless dragnets that test people for their willingness to break the law are offensive to the Constitution. *Cf. United States v. Armstrong*, 517 U.S. 456, 483 (1996) (Stevens, J., dissenting) (warning against "the danger of arbitrary enforcement" of the drug laws and invoking "the need for careful scrutiny of any colorable claim of discriminatory enforcement"). The Due Process Clause protects many of our rights, including the right be free from the use of law enforcement tactics that are inherently racially discriminatory. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) ("[T]he concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive. The 'equal protection of the laws' is a more explicit safeguard of prohibited unfairness than 'due process of law,' . . . [b]ut, as this Court has recognized, discrimination may be so unjustifiable as to be violative of due process.").

A similar analysis also applies to socio-economic discrimination. *Cf. Little v. Streater*, 452 U.S. 1 (1981); *Roberts v. LaVallee*, 389 U.S. 40 (1967); *Harper v. Virginia*

---

[1] It is not surprising that the record before us reveals that all of the *Black* defendants are in all likelihood black, although it is possible that one or more is Hispanic.

*Bd. of Elections*, 383 U.S. 663 (1966); *Douglas v. People of State of Cal.*, 372 U.S. 353 (1963); *Griffin v. Illinois*, 351 U.S. 12 (1956).[2] The danger of tempting otherwise law-abiding people into crime through reverse stings is substantially heightened when the government takes aim at poor neighborhoods and tempts their residents with the prospect of making large amounts of money through criminal activity.[3] *See Black*, 733 F.3d at 313 (Noonan, J., dissenting) ("'Lead us not into temptation' is part of a prayer familiar to many. But few, I believe, would think of this prayer as addressed to the government of the United States or would think it necessary to address the government with such a request."). At the right moment and when described in attractive enough terms, such offers may lead astray otherwise law abiding young men living in poverty, and motivate them to make false or exaggerated claims about their qualifications to serve as participants in the proposed venture—including claims about prior criminal experience that lack any substantial basis in truth. But it is not just individuals without any record with whom we must be concerned. In poor minority areas, there are many young men who, during their teenage years, have committed some non-violent or comparatively minor offenses, and who may be particularly susceptible to the government's suggestion that they engage in more serious criminal conduct. *See generally* Paul Butler, *Let's Get Free: A Hip-Hop Theory of*

---

[2] *See also, e.g.*, *United States v. Burgum*, 633 F.3d 810, 815 (9th Cir. 2011) (holding that "the Constitution prohibits imposition of a longer prison term based on the defendant's poverty").

[3] "A 'reverse sting' occurs when the government initiates the criminal conduct, setting up a fictitious crime and arresting the criminals as they begin to carry out what they believe is a real crime." *Black*, 733 F.3d at 313 n.1.

*Justice* (2010).     These young men may yet become productive, successful members of society, or their lives may be forever changed for the worse should they succumb to the government's blandishments.

The latter scenario is particularly likely in these difficult times of swiftly rising economic inequality and alarming levels of unemployment. *See* Joseph Stiglitz, *The Price of Inequality: How Today's Divided Society Endangers Our Future* (2013).     According to one economist, American income inequality has "been increasing steadily since the 1970s, and now has reached levels not seen since 1928." Drew Sesilver, *U.S. Income Inequality, On Rise For Decades, Is Now Highest Since 1928*, Pew Research Center (Dec. 5, 2013).     Many other studies confirm a vast expansion in inequality. *See, e.g.*, Estelle Sommeiller & Mark Price, *The Increasingly Unequal States of America*, Economic Policy Institute (2014); *Inequality, Growing Apart*, Economist (Sept. 21, 2013).     That disparity translates into many other inequalities in American life, including in the criminal justice system. *See, e.g.*, David Cole, *No Equal Justice: Race and Class in the American Criminal Justice System* 8 (1999) ("Police officers routinely use methods of investigation and interrogation against members of racial minorities and the poor that would be deemed unacceptable if applied to more privileged members of the community.").   Under the present economic circumstances, it is more important than ever to recall that reverse sting operations like the one we consider here are perilous to freedom, especially when they are aimed at the poorest amongst us and backed by the promise of immediate wealth.   Just as "the Constitution doesn't prefer the rich over the poor," *United States v. Pineda-Moreno*, 617 F.3d 1120 (9th Cir. 2010) (Kozinski, J., dissenting from denial of rehearing en banc), it does not leave the

impoverished defenseless against outrageous and unnecessary law enforcement tactics designed to prey on their unique vulnerabilities.

These concerns of fairness and equality are heightened by the pressing threat that these sorts of extraordinary tactics pose to liberty. The government verges too close to tyranny when it sends its agents trolling through bars, tempts people to engage in criminal conduct, and locks them up for unconscionable periods of time when they fall for the scheme. Certainly, such tactics create a relationship between government and governed at odds with the premises of our democracy—a relationship more like that depicted in George Orwell's *1984* or Philip K. Dick's *The Minority Report*.[4] As Justice Sotomayor has warned, "[a]wareness that the Government may be watching chills associational and expressive freedoms" and "may alter the relationship between citizen and government in a way that is inimical to democratic society." *United States v. Jones*, 132 S. Ct. 945, 956 (2012) (Sotomayor, J., concurring) (quotation marks and citation omitted). What is true of the government's watching is also true of the government's sending undercover agents into certain neighborhoods to see if their inhabitants can be tempted to engage in conduct that leads them to prison. The Due Process Clause forbids the tactics used here not only on grounds of equality and fairness, but also because widespread

---

[4] As the majority concedes, "The risk inherent in targeting such a generalized population is that the government could create a criminal enterprise that would not have come into being but for the temptation of a big payday, a work of fiction spun out by government agents to persons vulnerable to such a ploy who would not otherwise have thought of doing such a robbery." *Black*, 733 F.3d at 303.

use of such law enforcement practices would chill the exercise of many of our liberties.

In this era of mass incarceration, in which we already lock up more of our population than any other nation on Earth, it is especially curious that the government feels compelled to invent fake crimes and imprison people for long periods of time for agreeing to participate in them—people who but for the government's scheme might not have ever entered the world of major felonies.[5]   Of course, the government also controls the (often extraordinarily long) amount of time that its targets spend in prison after reverse sting operations, as it can specify the amount of drugs involved in the fake conspiracies.  *See United States v. Kindle*, 698 F.3d 401, 414 (7th Cir. 2012) (Posner, J., concurring and dissenting), *reheard en banc sub nom United States v. Mayfield* (7th Cir. Apr. 16, 2013) (condemning fictitious stash house stings as a "disreputable tactic" because "[l]aw enforcement uses them to increase the amount of drugs that can be attributed to the persons stung, so as to jack up their sentences").  Do we really need to add to the extraordinary number of our youth whom we now imprison those our government can induce to commit fictious crimes?  Do we really need to make felons out of those who are susceptible but have not yet committed serious offenses (and might not ever do so)?  Wouldn't it be more consistent with our constitutional values for the government to provide positive social programs, such as education, anti-drug, job-training, and housing services, that help prevent crime rather than to conjure up plots that encourage disadvantaged minority youth to join the large number of their cohort who are already serving long periods of incarceration?  *See, e.g.*, Jonathan Simon, *Governing*

---

[5] On mass incarceration, see generally Alexander, *The New Jim Crow*.

*Through Crime* (2007). Reverse sting operations of the sort used in this case, aimed at people who look "bad" in "bad parts of town," are one of the most extreme and chilling manifestations of an overzealous criminal system that too often fails to respect the boundaries of law, good public policy, and simple decency. *See* William J. Stuntz, *The Collapse of American Criminal Justice* (2011).

Whatever the motivation for the law enforcement conduct under review here and however effective that conduct may be at leading to the arrest of actual or potential criminals, the Constitution does not allow the tactics employed by the government. *Cf. Maryland v. King*, 133 S. Ct. 1958, 1989 (Scalia, J., dissenting) ("Solving unsolved crimes is a noble objective, but it occupies a lower place in the American pantheon of noble objectives than the protection of our people from suspicionless law-enforcement searches."). The outrageous government conduct doctrine is thus like the many other constitutional rules meant to protect liberty that limit law enforcement and require us to invalidate improper government conduct even when it has led to a conviction—even when it has been "bad people" whose rights have been violated. *See, e.g.*, *Miranda v. Arizona*, 384 U.S. 436 (1966); *Rogers v. Richmond*, 365 U.S. 534 (1961); *Mapp v. Ohio*, 367 U.S. 643 (1961). When the government decides to troll through poverty-stricken neighborhoods, ordering its agents to seek out people who look "bad" and test them at random for willingness to break the law in order to obtain large sums of money, its conduct is unacceptable.

Fundamental principles of justice place the tactics used by the government in the *Black* cases squarely out of bounds. *See Greene v. United States*, 454 F.2d 783 (9th Cir. 1971). Accordingly, the indictment should be dismissed.

## III

Pre-*Black* precedent construed the constitutional command regarding outrageous government conduct in a wholly different manner than does the majority. In case after case, we remarked that the government violates the Constitution when it uses artifice to cause a crime and to shape the nature and planning of that crime while targeting people who are not already known to be involved in a continuing series of similar crimes. *See, e.g.*, *United States v. Williams*, 547 F.3d 1187, 1199 (9th Cir. 2008); *United States v. Bonanno*, 852 F.2d 434, 437–38 (9th Cir. 1988). As Judge Noonan explains in his thorough and persuasive dissent, application of that rule requires dismissal of the indictment in these cases.

The majority, recognizing the force of these arguments, repeatedly concedes that the government's conduct was, at best, of doubtful validity under our precedents. It nonetheless upholds the law enforcement tactics by inventing a new, nebulous six-factor test for outrageous government conduct. In its analysis, the majority places seemingly controlling weight on two factors that have never before played a significant role in our doctrine: (1) boasting by the defendants about their prior criminal activity, none of which was ever confirmed by the government during the reverse sting operation; and (2) unsupported assertions by the government that it deemed this kind of operation to be more effective at fighting stash house robberies than the traditional means of doing so.[6] While purporting to adhere to precedent, this

---

[6] The majority also suggests that the government's conduct was not outrageous because Agent Zayas did not exercise complete control over every aspect of the reverse sting. Our cases, however, have never required

reasoning takes a significant step beyond the limits on government conduct that we have previously described, opening the door to conduct that the Constitution does not allow.

The panel first errs by asserting that what may have been pure puffery by Simpson and Black about experience with crime justified the government's conduct. Before the *Black* cases, we insisted that the government use such tactics only against known or suspected criminals, persons for whom, at the very least, there is reasonable cause for suspicion. *See, e.g.*, *United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003) (placing decisive weight on the fact that "the government did not initiate the criminal activity, but rather sought to crack an ongoing operation"). That limit on purportedly "random" police dragnets in vulnerable communities helped to prevent abuses forbidden by the Constitution.[7] *See supra* Part II. Here, by emphasizing some

---

total control or outright coercion. Here, the government created the scenario, described the kind of robbery it wanted of the defendants, urged Simpson and Black to involve more of their colleagues, and worked with the defendants to shape the details of the planned operation. This level of influence and control is more than enough to demonstrate intimate government involvement in the development of the criminal scheme. *See Greene*, 454 F.2d at 787 ("We do not believe the Government may involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators.").

[7] The majority thus takes a substantial step beyond our precedent in upholding police conduct where, by its own description, "the government created the proposed crime, initiated contact with the defendants through the CI's approach at the Glendale bar, and set the bait—all without any previous individual suspicion—or even knowledge—about the defendants' criminal history or activities." *Black*, 733 F.3d at 306.

unsupported boasting by two of the defendants as a significant factor in its analysis, the majority takes a long and unjustified step away from our precedent. Mere puffery by a person who has been approached at random in a bar is not the same as evidence that the target is involved in criminal activity—especially where the government has suggested to him that he join in unlawful conduct that would free him from his economic bonds. The fact that some people questioned at random may show interest and then make statements designed to enhance their credibility as potential conspirators does not make the underlying government conduct any less outrageous, especially where there is no evidence that these boasts are true and where the government makes no effort to check them.

The panel majority also errs in relying uncritically on the government's professed need for the use of its tactic. The government may not engage in outrageous conduct that violates the Due Process Clause merely because it asserts that doing so will advance law enforcement goals. This is a familiar rule in our criminal procedure jurisprudence. Our nation has spent decades engaged in a so-called "War on Drugs" and, for just as long, has struggled mightily to combat narcotics trafficking. Nonetheless, we have never held that the difficulties of preventing narcotics crime justify or excuse constitutional violations—and we should not do so now. Inevitably, that logic points the way to a string of government affidavits insisting that one or another hitherto illegal tactic must be upheld as important to the achievement of law enforcement objectives. Further, while reverse sting operations may sometimes be a useful tool in the police arsenal, the majority does not explain why these operations would be inadequate if confined to targets known or suspected to be involved in ongoing criminal activity. It is

both extreme and implausible to assert that the only solution to narcotics related crime is random good-citizenship tests of people who look like "bad guys" in a "bad part of town."

Ultimately, the most dangerous aspect of the majority opinion is that it virtually eliminates constitutional limits on outrageous government conduct. The majority reports that it is "troubled" and "concerned," that "the risks we have identified in such a government-created fictional operation are not to be taken lightly," but that other considerations play some unspecified role in helping to "mitigate[]" those worries. It justifies this result by emphasizing that it is looking to the totality of the circumstances. If 'totality of the circumstances' is to have any meaning at all, however, we cannot let each panel select its own "factors," whether listed in prior cases or not, and then conclude that in light of the factors it has chosen the totality of the circumstances is not enough to render the government's conduct outrageous. That is particularly true where, as here, on an objective analysis of the six factors distilled from our prior cases by the panel, the first five support a finding of a constitutional violation and the sixth simply misstates our prior law. Under the panel's approach there would never be limits established on the government's flouting of the fundamental rights of its citizens. In fact, its reasoning could easily be invoked in support of similar reverse stings that result in the conviction of individuals who do not brag of prior criminal experience and who lack any criminal history at all. Thus, while the defendants here may truly be bad guys, the tactics and doctrine the majority endorses pose a threat to constitutional values that extend far beyond the facts of this particular reverse sting.

The true lesson of the *Black* cases is that judges may express concern about shocking police tactics, but will ultimately uphold them—and that the outrageous government conduct doctrine has little or no continued vitality in this Circuit.  We should therefore have reheard this case en banc to make clear what our pre-*Black* precedent already states: the law enforcement tactics used here are unacceptable under the Constitution.

**IV**

As Judge Noonan warns in his dissent, "Today, our court gives our approval to the government tempting persons in the population at large currently engaged in innocent activity and leading them into the commission of a serious crime, which the government will then prosecute." *See Black*, 733 F.3d at 313 (Noonan, J., dissenting).  These cases demonstrate the government's willingness to infringe upon values of equality, fairness, and liberty in its reverse sting operations, and to employ law enforcement tactics that cross the line established by the Due Process Clause.  The panel majority erred in upholding the conduct in which the government engaged here, both in light of our precedent and as a matter of constitutional principle.  I therefore dissent.