PRECEDENTIAL


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 14-3561
_____

UNITED STATES OF AMERICA

v.

RALPH DENNIS,
                    Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.N.J. No. 1-12-cr-00734-001)
District Judge:  Honorable Joseph E. Irenas

Argued November 19, 2015

BEFORE:  AMBRO, HARDIMAN, and
NYGAARD, *Circuit Judges*


(Filed: June 24, 2016)

Lawrence S. Lustberg, Esq.
Jillian T. Stein, Esq.
Benjamin Z. Yaster, Esq.    [Argued]
Gibbons
One Gateway Center
Newark, NJ 07102
        *Counsel for Appellant*

Mark E. Coyne, Esq.         [Argued]
Office of United States Attorney
970 Broad Street, Room 700
Newark, NJ 07102

Glenn J. Moramarco, Esq.
Office of United States Attorney
Camden Federal Building & Courthouse
401 Market Street
Camden, NJ 08101
        *Counsel for Appellee*

_____

OPINION
_____

NYGAARD, *Circuit Judge.*

I.

Ralph Dennis seeks a new trial, asserting that the District Court erred by denying his request to instruct the jury on an entrapment defense and by denying his motion for dismissal asserting outrageous prosecution. He also contends

2

that his sentence violates the Eighth Amendment of the United States Constitution. Dennis was convicted of conspiracy to rob a narcotics "stash house," pursuant to 18 U.S.C. § 1951(a), 21 U.S.C. §841(a)(1), and 21 U.S.C. §841(b)(1)(A). He was also convicted of carrying a firearm during the commission of the crime, pursuant to 18 U.S.C. § 924(c)(1)(A)(i). The District Court sentenced Dennis to 180 months' imprisonment, the statutory minimum.

Dennis maintains that Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) agents induced him, through a friend, to participate in a reverse sting that was designed to incriminate him and co-conspirators.[1] We agree that the District Court should have given an entrapment instruction on the robbery and gun possession charges. Therefore, we will vacate the judgment of conviction and sentence as to these charges and remand for a new trial. The judgment is affirmed on the remaining drug charge.

II.[2]

---

[1] Dennis was tried with Terrance Hardee who was convicted for his role in the "stash house" robbery. The United States separately appealed Hardee's 92-month sentence, Hardee did not appeal or cross-appeal. We remanded for resentencing in that case for reasons that do not change our analysis here. Another conspirator, John Mitchell, pleaded guilty and received a 78-month sentence.

[2] For purposes of our review of Dennis' appeal of the District Court's denial of his request for an entrapment instruction, we will resolve all factual conflicts in favor of Dennis "no matter how improbable we may find the defense version of the

3

In June 2012, ATF agents in Camden, New Jersey met with Kevin Burk, a convicted felon facing forgery charges who had been cooperating with local law enforcement as a confidential informant. The agents were investigating a string of robberies in Southern New Jersey and Philadelphia County, Pennsylvania. Upon being questioned about associates who were involved in robberies or violent crimes, Burk responded that Dennis had spoken of conducting home invasions and other robberies. The ATF agents were unaware of Dennis prior to this. Burk added that Dennis recently had been detained at the Camden County Jail.

The agents confirmed Dennis' detention and then conducted a criminal record search. They discovered that Dennis had several felony convictions for possession with intent to distribute small amounts of crack cocaine between 1996 and 1998, burglary of a motor bike in 2003, and for possessing with intent to sell multiple pounds of marijuana in 2011. Burk then told agents that Dennis had previously requested his help in robbing a check-cashing operation, but he had declined. Dennis later testified that this was false. J.A. 1040. [3]

---

facts." *United States v. Watson*, 489 F.2d 504, 507 (3d Cir. 1973).

[3] Dennis testified that it was Burk who had requested Dennis' help in these robberies. Dennis testified that he declined three prior invitations. Burk's brother later corroborated one of the incidents that Dennis alleged with eye-witness testimony. For purposes of our review, we accept Dennis' version of these interactions.

4

ATF agents instructed Burk to ask Dennis for his help, supplying Burk with a fictional back-story: he was to tell Dennis that he needed his help to carry out a robbery. Dennis and Burk were friends, and each was acquainted with the other's family members. J.A. 1002-03. Together they engaged in small quantity cocaine purchases and sales. Additionally, after Burk served a sentence for his drug activities, he and Dennis became involved in pound-quantity marijuana sales, traveling to Texas together on more than one occasion to purchase a supply of marijuana. J.A. 1009. Dennis was arrested for this activity. He testified that, after this, he attempted to break free of a life of crime, but admits he still purchased small quantities of cocaine for Burk. Eventually, Dennis violated parole and was incarcerated for 60 days in the Camden County jail.

Burk tried, on a number of occasions, to enlist Dennis' help in various robbery schemes. Dennis said that, three times, Burk asked for his help to carry out bank robberies. He declined each time. J.A. 1017-21. On Burk's third attempt, Dennis recalls that Burk told him he already had the guns and the scanner needed for the job. J.A. 1022. Dennis says that he refused to help Burk. Two weeks later, Burk approached him to ask for his help in robbing a stash house. This time, Burk told him that the job was necessary to help out his mother who had cancer. Burk told him that "Rock," a disgruntled drug courier for a Mexican drug cartel, was the point person for the job. Burk said that the robbery would yield 30 to 40 kilograms of cocaine with a street-value of $2 million. J.A. 1027-28. Dennis agreed. This was the beginning of the ATF's reverse sting operation.

5

During the discussion between Burk and Dennis about the stash house robbery, John Mitchell (an acquaintance of Dennis) drove by. He questioned Dennis about his meeting with Burk. J.A. 1029. Later, Dennis told Mitchell about the plan, asked him to help, and introduced him to Burk. Mitchell agreed to assist.[4] Dennis portrayed Mitchell as someone who "robbed . . . young bulls in the neighborhood" and as someone who often carried a gun. J.A. 1055.

Burk set up the first meeting between the ATF agent, Dennis and Mitchell for June 21, 2012. Before the meeting, Burk told Dennis and Mitchell that they needed to impress Rock because he was "the real thing." J.A. 1029. Burk asked them to "play the role" to impress Rock so that they could get the job. J.A. 1030. Dennis said that he and Mitchell complied.

The ATF agent posing as Rock (Greg Sheridan) met with Burk, Dennis, and Mitchell in Pennsauken, New Jersey, and provided more details about the job.[5] Rock explained that he was seeking revenge because the cartel refused to loan him money to help his ailing mother. Rock went on to explain his role as courier, and he shared his observations of how the cartel's stash houses operated. Dennis and Mitchell both asked questions on details about how the stash house

---

[4] Mitchell testified that Dennis met him at a bar and told him about Burk's plan to rob a stash house.

[5] Most meetings were recorded with audio and video. The narrative of these meetings in this opinion is drawn both from trial testimony and from the transcript of the recording shown to jury.

6

would be guarded. Dennis expressed concern about retribution directed at Rock, and indicated that the plan had to insulate Rock from any suspicion of being involved. J.A.1323-24. Rock also stressed that they had to have a well-executed plan because the stakes were high. J.A. 1311-12. Dennis initially stated that they would have to put the guards down, and that they would "fold" when he put a gun in the mouth of one of the guards. J.A. 1032, 1312. Later in the meeting he suggested they only subdue and tie up the guards. J.A. 1035. Dennis also told Rock that they would bring a .40 caliber gun and a .357 magnum gun. Nonetheless, he testified that he felt he was in over his head, though he did not show this to Rock. J.A. 1035. He said that he was saying these things solely to impress Rock, and to probe his intent. J.A. 1033, 1035, 1037. Dennis testified that he did not own a gun. He last had a gun when he was fifteen years old. He explained that the reason for this was that he "wasn't trying to go that route, like whatsoever, as far as hurting somebody or somebody hurting me or anything. So, I just got rid of [the gun]." J.A. 1013-14.

Rock offered Mitchell and Dennis a chance to back out. Both declined this opportunity. Burk said that they needed another meeting to figure out whether Rock was law enforcement. J.A. 1039. However, he also told Dennis that Rock had been a good friend ten years earlier and that he was "the real deal." J.A. 1041. Dennis suggested that they needed another man to be part of this plan to have someone who was physically intimidating enough to handle the guards. J.A.1041-42. This man was Terrance Hardee.

During two later meetings, on June 27, 2012 and on July 10, 2012, the group discussed their plan. Rock again

expressed his feeling of betrayal toward the cartel for its refusal to help him. He told the group that there were usually between 15 and 20 kilograms of cocaine at the stash house, and that it was guarded by two individuals, one being armed. The conversation moved on to how they would be compensated for the job. Rock cautioned them that they would need to repackage the cocaine they received from the heist to avoid being tracked by the cartel. Dennis responded that he had already thought of that, and planned to split the kilogram packages of cocaine and re-wrap them. J.A. 466-67.

As for the robbery, Rock told the group that he received only general information one day in advance about the stash house location. He suggested that Mitchell could hide in the back of his SUV as they approached the stash house and characterized the proposed robbery as relatively easy because the stash house guards were "slippin a little bit." J.A. 1366. Dennis suggested that they would use stun guns to subdue the guards. During the meeting, Mitchell appeared to assume that Dennis would accompany him into the stash house, but Dennis made it clear that he would stay parked outside, and send in someone who was bigger and more threatening. He told the group he would be listening on a cell phone. J.A. 1375-77.

Mitchell requested a third meeting to get clarity on the specific roles each one would play in the robbery and how they would approach the stash house. Burk called Rock to set it up. At that July 10, 2012 meeting, they talked through how Rock, Mitchell, and a third man (Hardee) would enter. Mitchell and Dennis agreed that those who entered the stash house behind Rock should present themselves as DEA agents and subdue with stun guns and zip ties both the armed guard

8

at the door and the unarmed guard watching over the cocaine bricks in the kitchen. Dennis stated that their objective was to get in and out quickly with "nobody gettin' hurt." J.A. 1400. He also suggested that he take Rock's truck after the robbery to strengthen the perception that Rock was not involved in it. Dennis testified that he was very nervous at this point and wrestled with whether he wished to follow through on the job. J.A. 1057.

After the July 10, 2012 meeting, Burk reminded Dennis that he told the group he had two guns he would bring. J.A. 1063. Dennis questioned whether another gun was needed, since Hardee was going to go into the stash house with a stun gun. Burk pressed that it was necessary for Dennis to have a gun in his role as lookout. J.A. 1065. The next day, Burk stopped by again and gave Dennis a red bag containing a gun. He asked Dennis to keep the bag at his residence. J.A. 1066. Dennis testified that this was one of the guns found when they were arrested. J.A. 1067. A second gun found at that time belonged to Mitchell.

Dennis received a message on July 15, 2012, that the robbery would take place on the next day. Dennis and Mitchell purchased zip ties but did not purchase DEA shirts as planned. J.A. 609. Dennis, Mitchell, and Hardee met that evening to discuss the plans for the robbery. The next morning, the group departed for Cherry Hill, New Jersey, in Burk's vehicle. At that point, they were in possession of two guns, one stun gun, gloves, and zip ties. Once in Cherry Hill, the group traveled in two cars to a storage facility to prepare for and rehearse the robbery. Once there, Rock told the group that they could leave his share of the cocaine in the storage unit. He gave the gate code to enter the storage facility to Mitchell. Rock talked through the details of how the stash

9

house is set up. The group then walked through the robbery, rehearsing how it would unfold. After they completed this walk-through, ATF agents rushed in on the group and arrested Dennis, Mitchell, and Hardee.

Mitchell pleaded guilty. Hardee and Dennis were tried together. Dennis first moved to have the indictment dismissed on the basis of outrageous prosecution. The District Court ruled that it could not "find anything inherently outrageous or unfair or something that shocks [the] conscience." J.A. 42. The District Court left open, however, the possibility of revisiting the motion if evidence at trial warranted. It never did so.

Dennis then proceeded with an entrapment defense. Dennis testified on his own behalf and called two other witnesses: Dr. Carol Armstrong and Seth Lawrenson. Dr. Armstrong, a neuropsychologist who examined Dennis, concluded that he suffers from neurocognitive impairments, with an IQ score of 74. She testified that Dennis was impaired in "[h]is ability to correct his thinking, his ability to reason or . . . to infer what the consequences are of a thought that he has." J.A. 890. She responded in the affirmative when asked: "Do you believe that Ralph Dennis was more susceptible to influence than otherwise healthy individuals would be in this case?" J.A. 889. Lawrenson, Burk's brother, testified to witnessing, on one occasion, Dennis decline Burk's request to help him rob a bank.

After the defense rested, the District Court considered Dennis' request for a jury charge on entrapment. The District Court concluded that Dennis' own testimony established a predilection to commit crimes with Burk as demonstrated by

his long association with him and the number of crimes the two committed together. It also ruled that the record provided no evidence that Dennis was hesitant to join in the conspiracy. J.A. 99-100. The District Court said that any inference drawn from his refusal to participate in previous crimes with Burk could "cut both ways," and could show that Dennis was fully capable of choosing what criminal activity he wanted to engage in. J.A. 102. Moreover, the District Court ruled that his words and actions showed a ready willingness to become involved. This conclusion was strengthened by his recruiting of Hardee to help carry out the robbery. J.A. 97. Finally, Dennis' resolve to participate was demonstrated by his refusal to sever himself from the group after the ATF undercover agent explicitly gave him an opportunity to leave. In the District Court's assessment, all of this evidence was "overwhelming" compared to the "small" evidence Dennis proffered in his testimony: stating that he was a reluctant participant, that he had not owned a gun, and that the use of Burk's mother in persuading him to join the conspiracy weighed heavily on his decision. J.A. 99.

III.

Entrapment

Dennis first argues that he is entitled to a new trial because the District Court erred by denying his request for a jury instruction on entrapment. We give plenary review to a District Court's denial of a motion for a jury charge of entrapment. *United States v. Fedroff,* 874 F.2d 178, 182 (3d Cir. 1989). "Entrapment occurs when a defendant who was not predisposed to commit the crime does so as a result of the government's inducement." *United States v. Jannotti,* 673 F.2d 578, 597 (3d Cir.) (en banc) ("*Jannotti I* "), cert. denied,

457 U.S. 1106 (1982). There are two elements of proof: inducement by the government to commit the crime, and the defendant's lack of predisposition to commit the crime. *United States v. Wright*, 921 F.2d 42, 44 (3d Cir. 1990). A defendant who requests the District Court to instruct the jury on an entrapment defense has a "burden of production" with regard to both elements. *United States v. El-Gawli*, 837 F.2d 142, 145 (3d Cir. 1988).

The defendant must first produce enough evidence to show inducement by the government. A "mere solicitation" or request by the government to participate in a criminal activity, without more, is not inducement. *Wright,* 921 F.2d at 45. Likewise, merely opening an opportunity for a crime is insufficient. *Mathews v. United States,* 485 U.S. 58, 66 (1988). Rather, the defendant must show that law enforcement engaged in conduct that takes the form of "'persuasion, fraudulent representation, threats, coercive tactics, harassment, promises of reward or pleas based on need, sympathy or friendship.'" *Wright*, 921 F.2d. at 45 (quoting *Fedroff,* 874 F.2d at 184).

The District Court noted that this was a reverse sting operation, and it appeared to agree with Dennis that the inducement prong of the analysis had thus been met. We too are convinced that the first prong of the analysis has been met, but we are not so quick to conclude that it is simply because it was a reverse sting. Rather, there were a number of elements of this particular operation that lead us to conclude that Dennis met his burden to raise a question about inducement.

A major factor in our conclusion is the central role that Burk, the ATF's confidential informant, played in getting Dennis to participate in the scheme. Dennis had no known connections to the crimes the ATF was investigating at that time and was only targeted after Burk produced Dennis' name in response to the ATF's general inquiry about people he knew who were involved in robberies. Moreover, Burk's personal relationship to Dennis contributed to the operation by allowing Burk to appeal to Dennis' sympathies based on the story of Burk's sick mother whom Dennis had met on a number of occasions.[6] We also note that Burk: recruited

---

[6] The Government argues that Dennis never explicitly said that Burk's friendship, nor the story of Burk's ailing mother, influenced his decision. We disagree. On cross examination, Dennis was asked if anything other than personal risks and rewards motivated his involvement in the robbery. J.A. 1138. He responded that there was more to why he agreed to join the scheme. *Id.* The prosecutor immediately followed up by asking why he never said anything along the lines of "gee, [Burk], this is really gonna help your mother." *Id.* Dennis responded that he had done so, but his statements were not caught on the ATF's recordings and that many of his conversations with Burk took place outside the presence of ATF agents and their equipment. J.A. 1138–39. This exchange indicates that Burk's plea affected Dennis' decision to join the scheme. And this is unsurprising—a friend whom he had known for years asked for help to pay for his mother's cancer treatment. While it is true that Dennis never uttered the words that "friendship motivated his participation" in the stash house scheme, we find a plea of friendship to lie at the basis of Burk's plea for help. Indeed, the entirety of Burk and Dennis' conversation seems predicated on friendship. This

13

Dennis, set up the first meeting with the ATF agent, drove Dennis to the meeting, and asked that Dennis "play the role" of a seasoned robber.[7]

Each of Burk's assists, by themselves, would not necessarily be enough to tip the scales to constitute inducement. However, collectively, they carry great weight. When this is added to the substantial financial payoff that was pitched to Dennis ($1.5 million to $2 million), we are convinced that the Government's efforts properly can be classified as inducement. The Government's action exceeded a situation in which it merely opened up an opportunity for committing a crime.[8] Here, the Government targeted an

---

view is only strengthened by the fact that we are required to interpret the record in a manner favorable to Dennis. Additionally, Dennis' testimony about all of Burk's appeals to him to assist in various schemes is consistent with the proposition that their friendship played a role. *See* J.A. 1017- 22 (describing the nature of Burk's unsuccessful appeals for his help in robbery schemes); J.A. 1022- 27 (describing the nature of Burk's successful appeal for help with the stash house scheme).

[7] Later, Burk convinced Dennis of the need for Dennis to have a gun during the robbery, and then he supplied the gun to Dennis. This evidence, though occurring well after Dennis was induced, is relevant to the charge for gun possession.

[8] The Government's actions "exceeded the typical sting in which the government merely offers an ordinary opportunity to commit a crime, without more." *United States v. Blitch*, 773 F.3d 837, 845 (7th Cir. 2014), *as amended on denial of reh'g and reh'g en banc* (Jan. 27, 2015), *cert. denied sub*

individual previously unknown to it and, with the help and persuasion of an informant who was a friend of the target, actively led him into the commission of a crime. This satisfies Dennis' burden on inducement.

We next examine whether there was sufficient evidence to raise a reasonable doubt about Dennis' predisposition to commit the crime. *United States v. Jannotti,* 729 F.2d 213, 225 (3d Cir. 1984) ("*Jannotti II*"); *United States v. Bocra,* 623 F.2d 281, 285 (3d Cir.), *cert. denied,* 449 U.S. 875 (1980) ("[K]ey to the successful establishment of an entrapment defense is proof that the defendant was not predisposed to commit the crime and that the criminal intent in fact originated with the Government."). "The basic question in an alleged entrapment case is whether the accused was ready and willing to commit the crime if any opportunity should be presented, or whether a person not otherwise disposed to wrongdoing was corrupted by some overreaching or special inducement, often amounting to reprehensible conduct." *Watson*, 489 F.2d at 509. "In general, predisposition may be defined as the defendant's inclination to engage in the crime for which he was charged, measured before his initial exposure to government agents." *Fedroff,* 874 F.2d at 182 (citations and footnote omitted).

Dennis argues that the record contained more than sufficient evidence to meet his burden of showing that he lacked a predisposition to commit this crime. He focuses on

---

*nom. Carwell v. United States*, 135 S. Ct. 2371 (2015) (quoting *United States v. Mayfield*, 771 F.3d 417, 434 (7th Cir. 2014) (en banc)).

15

the following facts:  the absence of robbery or violent crimes in his criminal history; his partially corroborated testimony of turning away three prior opportunities to join Burk in robberies; his disavowal of violence on the stand; his testimony that he has not owned a gun in many years; and the expert testimony of his vulnerability to being persuaded due to his low IQ.

Even with all of this evidence, the District Court still concluded that he did not produce enough evidence to ground a jury instruction on entrapment, stating that there is "almost no evidence of an absence of predilection and overwhelming evidence of a predisposition or predilection to commit the crime." J.A. 101.  The District Court was convinced that the recordings of the meetings between Dennis and the others showed him to be an "eager participant" despite testimony that Dennis was told to "play the role" to impress Rock.  J.A. 100, 1030.  The District Court regarded Dennis' long association with Burk in previous drug crimes as strong evidence of predilection.  It also recognized that Dennis had, on three previous occasions, declined to join Burk in robbery plans.  It acknowledged that a positive inference could be drawn from this information, giving significance to Burk's use of an ailing mother as an important factor in Dennis' decision to accept Burk's solicitation in this case.  However, the District Court reasoned that this inference could "cut both ways" and that the stronger inference from this testimony was that Dennis felt free to accept or decline Burk's solicitations at will.  J.A. 102.

Dennis says that the District Court erred by weighing this evidence and by drawing inferences against him.  He goes on to assert that these defects in the District Court's

16

deliberation of his motion for an entrapment instruction pertain to all of the counts on which he was convicted since the drug conviction was inextricably entwined with the robbery conspiracy.

The Government suggests that the favorable review standard that Dennis applies is proper only for motions considered pretrial. Citing to *Marino*, it contends that, since Dennis was permitted to present his evidence in support of an entrapment defense, the District Court was permitted to weigh the evidence to decide Dennis' motion. *United States v. Marino*, 868 F.2d 549, 554 (3d Cir. 1989). However, *Marino* is distinguished because it was focused on the need for a separate evidentiary hearing. It held that a separate hearing was not necessary to rule on the entrapment motion because all of the defendant's evidence relevant to entrapment was presented at trial, and it was insufficient to justify an instruction. *Id.* The timing of the motion does not alter the necessity of the District Court to refrain from invading the province of the jury. Here, it was not for the District Court to decide the evidence "cut both ways" and draw a conclusion against Dennis. Similarly, it was impermissible for the Court to credit the Government's evidence when Dennis presented evidence to the contrary. Therefore, we conclude that the District Court did err by weighing evidence and by improperly drawing inferences against Dennis on the robbery and firearm charges. However, as we will explain further below, there is no such error as to Dennis' conviction on the drug conspiracy charge.

The Government argues in the alternative that, even if the District Court did commit such errors, Dennis is not entitled to a new trial because the errors were harmless. It

17

notes that—in spite of the District Court's denial of his motion for an instruction—Dennis was still able to proffer all of his evidence on entrapment. Therefore, even though the District Court may have erred in its deliberation of evidence supporting the motion, our harmless error review—like the jury's—encompasses the entire record. As a result, it asserts, the District Court's review of the entire record is ultimately excusable because the jury was able to weigh all of the evidence and it still convicted Dennis on the strength of the evidence the Government presented.

"Unless the appellate court believes it highly probable that the error did not affect the judgment, it should reverse." *Government of Virgin Islands v. Toto,* 529 F.2d 278, 284 (3d Cir. 1974); *Jannotti II*, 729 F.2d at 225. As the Government acknowledges, if Dennis' motion for an entrapment instruction had been granted, "the government [would have] had the entire burden of disproving entrapment beyond a reasonable doubt." *El-Gawli*, 837 F.2d at 146. Therefore, although it is true that the jury was able to weigh all of the evidence—including Dennis' entrapment evidence—it did so without considering whether the Government carried its burden of proving beyond a reasonable doubt that it did not entrap Dennis to commit the crimes of conspiracy to commit robbery and gun possession. Given that we have already ruled that Dennis presented sufficient evidence to create reasonable doubt about inducement and his predisposition to commit these crimes, we cannot conclude that it is highly probable that the District Court's error did not affect the judgment as to these crimes.

Nonetheless, Dennis' reliance on his criminal record to make his case for a lack of predisposition for committing

18

robbery and possessing a gun does not help him show that he was not predisposed to commit drug crimes. His history of convictions for possession and distribution of cocaine and marijuana contradicts Dennis' assertion that he was not predisposed to commit the crime of possessing and distributing cocaine. Dennis' attempt to distinguish his record of dealing in small quantities of cocaine from the large quantity of cocaine at issue here is unavailing. *See, e.g.*, *United States v. Blitch*, 773 F.3d 837, 845 (7th Cir. 2014) (finding that a prior conviction for delivering nine grams of cocaine "demonstrate[d] that [the defendant] was predisposed to join a drug trafficking conspiracy" that dealt in kilogram quantities of cocaine), *as amended on denial of reh'g and reh'g en banc* (Jan. 27, 2015)*, cert. denied sub nom. Carwell v. United States*, 135 S. Ct. 2371 (2015). Similarly, we are not convinced that his marijuana conviction has little relevance because this case involved cocaine—both involve the distribution of large quantities of illegal drugs. *See United States v. Gambino*, 788 F.2d 938, 945–46 (3d Cir. 1986) (stating that evidence of trafficking cocaine was relevant for determining whether the defendant was predisposed to distribute heroin); *United States v. Simtob*, 901 F.23d 799, 807 (9th Cir. 1990) ("Where entrapment is in issue . . . prior drug offenses [can be relevant] if the earlier conviction tends to prove that defendant was engaged in illegal operations in some way similar to those charged in the indictment, even if the drugs involved may be different."). Putting all of this evidence together leads us to conclude Dennis had a predisposition to distribute kilograms of cocaine.

Finally, we are not persuaded by Dennis' suggestion that the drug conviction should be reversed solely because it is entwined with the robbery and firearm convictions. As we

have previously discussed, a defendant must produce evidence that he lacked the predisposition to commit the crime for which he is charged to receive an entrapment instruction. The fact that a defendant is charged with multiple counts arising from the same course of conduct does not vitiate the burden to do so for each count for which the defendant seeks an instruction. As the Eleventh Circuit Court of Appeals persuasively reasoned when faced with a similar question:

> [E]ven if the counts charged in the Indictment formed part of the same course of conduct, and even if [the defendant was] induced as to all counts, there is still the question of whether [he was] predisposed to commit each of the crimes at issue. Because of the subjective, fact-intensive nature of the predisposition inquiry, it may well be that the facts of a given case indicate that an individual defendant is predisposed to commit some crimes, but not others.

*United States v. Isnadin*, 742 F.3d 1278, 1302 (11th Cir. 2014) (upholding an instruction that allowed a jury to evaluate entrapment on a count by count basis); *see also United States v. Millet*, 510 F.3d 668, 674–78 (7th Cir. 2007) (upholding a district court's decision to instruct the jury on entrapment related to a gun charge, while refusing an entrapment instruction pertaining to related drug charges), *as amended on denial of reh'g en banc* (June 27, 2008). Here,

20

Dennis failed to show a lack of predisposition for his drug conviction, but was successful in doing so for his conspiracy to commit robbery and firearm possession convictions. Thus, he was entitled to an entrapment instruction as to the latter, but not the former. As each conviction exists independently; so, too, must the justifications for an accompanying entrapment instruction.

## IV.

### Outrageous Prosecution

Dennis contends not only that he is deserving of a new trial, he also asserts that the indictment against him should be dismissed on the basis of an outrageous prosecution that violated his constitutional right to due process.[9] The evidentiary burden is exceedingly great, requiring the defendant to show that the government essentially "created the crime for the sole purpose of obtaining a conviction." *United States v. Pitt*, 193 F.3d 751, 759-60 (3d Cir. 1999). Accordingly, dismissal under this circumstance is rare, occurring only where the government's conduct is "shocking, outrageous, and clearly intolerable." *United States v. Nolan-Cooper,* 155 F.3d 221, 231 (3d Cir. 1998). This constitutional claim "should be accepted by a court only to 'curb the most intolerable government conduct.'" *United States v. Beverly*, 723 F.2d 11, 12 (3d Cir. 1983) (quoting *Jannotti*, 673 F.2d at 608).

---

[9] We review the District Court's factual findings for clear error, and give plenary review to its legal conclusions. *United States v. Christie,* 624 F.3d 558, 572 (3d Cir. 2010).

Much of Dennis' argument supporting his assertion of outrageous prosecution reiterates claims he made in the context of his appeal regarding entrapment. [10] Dennis contends that the Government created the crimes; that it had no credible basis for asserting that he was supporting himself and his family with criminal activity, nor any basis for suspecting Dennis would participate in the crimes; that the Government actively encouraged Dennis to participate in the crimes; and finally, that it provided the necessary information and implements for the crime. However, "a successful due process defense must be predicated on intolerable government conduct which goes beyond that necessary to sustain an entrapment defense." *Jannotti*, 673 F.2d at 607. Dennis must do more than merely show enough to convince a judge that a reasonable juror could doubt his predisposition or intent to commit the crime.

We dismissed a claim of outrageous prosecution in *Beverly* even though the entrapment defense was raised and instructed. *Beverly*, 723 F.2d at 12-13. Similar to the instant case (if we accept Dennis' testimony as true), the ATF agent in *Beverly*: induced a person introduced by an informant to

---

[10] Dennis argues for the first time on appeal that the Government structured the crime to maximize Dennis' punishment, and that the ATF's reverse sting operations disproportionately target men of color, like Dennis. We are not persuaded by Dennis that good cause exists for us to exercise our discretion to review them or, alternatively, to remand the issue to the District Court for further fact finding. The record provides no indicia of an outrageous abuse of the Government's prosecutorial authority here.

22

commit a crime, supplied him with items necessary to carry it out, and transported him to the location where the crime was to be committed. *Id.* In our dismissal, we noted the Supreme Court's admonishment to refrain from exercising "'a Chancellor's foot' veto over law enforcement practices of which it [does] not approve.'" *Id.* at 13 (alteration in original) (quoting *United States v. Russell*, 411 U.S. 423, 435 (1973)). The same rationale applies here.[11]

V.

Conclusion

For all of the reasons stated above, we will reverse the judgment of conviction and sentence only on Count I, conspiracy to commit robbery pursuant to 18 U.S.C. § 1951(a), and Count III, using and carrying a firearm during and in relation to a crime of violence pursuant to 18 U.S.C. § 924(c)(1)(A)(i). We will remand to the District Court for a new trial. The judgment of conviction and sentence is affirmed on Count II, conspiracy to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. §841(a)(1) and 21 U.S.C. §841(b)(1)(A).

---

[11] Because we are reversing and remanding for a new trial on the robbery and firearm counts of the indictment, we will not address Dennis' remaining claim that his sentence of fifteen years violated the Eighth Amendment.

23

AMBRO, <u>Circuit Judge</u>, dissenting in part and concurring in part

Offered the chance to participate in a stash house robbery, Ralph Dennis agreed without hesitation. This case is thus a straightforward application of the Supreme Court's rule that a defendant is not entitled to an entrapment instruction when the evidence shows, at most, that the Government "merely afforded an opportunity or facilities for the commission of the crime." *Mathews v. United States*, 485 U.S. 58, 66 (1988). Despite Dennis' eager participation, the majority concludes that the District Court was required to instruct the jury on entrapment. Because I believe that conclusion fails to follow *Mathews*, I respectfully dissent from that portion of the opinion. Meanwhile, I join the majority's due process analysis but write separately to express some concerns about the practice of stash house reverse stings.

We have held, based on *Mathews,* that "evidence of mere solicitation, as a matter of law, is not germane to the jury's determination of entrapment." *United States v. Marino*, 868 F.2d 549, 552 n.6 (3d Cir. 1989). In *Marino*, a Government informant asked an attorney to deal in stolen securities. *Id.* at 550. The attorney agreed and thereafter became an active participant, initiating communication with the informant and attending secretive meetings. *Id.* at 550–51. We held that the District Court "correctly refused to instruct the jury on entrapment" because the informant "merely offered [the defendant] the opportunity to commit the offense" and because, after receiving the offer, he "exhibited no reluctance." *Id.* at 554.

Same here. As the District Court explained, the record lacks "even the slightest indication of reluctance . . . to

1

participate in this crime." App. 96.[1] And once Dennis joined the conspiracy, he contributed enthusiastically. For instance, he brought in two other co-conspirators (John Mitchell and Terrance Hardee) and helped choreograph the planned robbery by suggesting that the crew should tie up the guards in the stash house.

Recognizing that mere solicitation is not enough, we have set out a non-exhaustive list of ways that a defendant can demonstrate entitlement to an entrapment instruction. These avenues include showing "persuasion, fraudulent representation, coercive tactics, [or] pleas based on need, sympathy, or friendship." *United States v. Fedroff*, 874 F.2d 178, 185 (3d Cir. 1989). The majority rests its analysis primarily on the last item in the list—"pleas based on need, sympathy, or friendship." It contends that "Burk's personal relationship to Dennis contributed to the operation by allowing Burk to appeal to Dennis' sympathies based on the story of Burk's sick mother whom Dennis had met on a number of occasions." Maj. Op. at 13.

---

[1] As the majority notes, Dennis testified that he had previously turned down other requests from Kevin Burk, the confidential informant, to commit similar crimes. The majority properly avoids suggesting that these incidents bear on inducement. Rather, it correctly contains its discussion of them to the predisposition prong. The stash house robbery was the first crime that Burk proposed to Dennis on behalf of the Government. Entrapment is concerned with inducement by the Government, not with requests made by private parties with their own agendas. *See, e.g.*, *United States v. Squillacote*, 221 F.3d 542, 573 (4th Cir. 2000) (noting that a "defendant who was induced to commit a crime by a private party, without any government involvement, cannot claim that he was entrapped").

Though there is a low bar for getting a jury instruction on entrapment, doing so based on personal relationships is relatively difficult. *See, e.g.*, *United States v. Evans*, 216 F.3d 80, 90 (D.C. Cir. 2000) ("Although we have in the past indicated that [such pleas] can satisfy the inducement prong of an entrapment defense, we have never found such a plea sufficiently strong to do so."). But here the problem runs deeper. Though Dennis testified at length, he never said that sympathy for Burk's mother had anything to do with his decision to join the conspiracy to rob the stash house.

The majority acknowledges this problem. It concedes that it is "true that Dennis never uttered the words that 'friendship motivated his participation' in the stash house scheme," but it nonetheless finds "a plea of friendship to lie at the basis of Burk's plea for help." Maj. Op. at 14 n.6. My colleagues base this conclusion on Dennis' testimony that he told Burk that the money from the robbery "is really gonna help your mother." *Id.* (quoting App. 1138). But Dennis' recognition that the money would help Burk's mother does not mean that this caused him to agree to the robbery. Our duty to interpret the record in Dennis' favor does not include an obligation (or, for that matter, a license) to put words in his mouth. If Dennis had said he perceived an obligation to help Burk's mother, the majority would be on stronger footing. But he did not, and we should not proceed as though he had.

Apart from the sympathy theory, the majority also emphasizes that the ATF did not have Dennis on its radar prior to the sting. However, it never explains how this relates to inducement. As discussed below, the Government's selection of targets might bear on a due process analysis. But the question for our purposes is not how the Government found Dennis, but rather the methods it employed to secure his willingness to commit a crime. Ultimately, the evidence

3

shows that Dennis did not take much (or even any) convincing.

None of this should suggest that entrapment instructions are unavailable in the context of stash house reverse stings. In fact, they frequently are required. For instance, the Seventh Circuit, sitting *en banc*, determined that a defendant had a right to an instruction because the Government engaged in a "concerted effort" to get him to agree to rob a stash house. *United States v. Mayfield*, 771 F.3d 417, 421 (7th Cir. 2014) (*en banc*). The defendant declined all of the initial offers, but the Government's informant persisted by bringing up the subject "[e]ach day" over an extended period. *Id.* This is classic evidence of inducement.

But less than a month later, a panel of the Seventh Circuit decided another stash house reverse sting case that looks a lot more like ours, and it concluded that no entrapment instruction was required. My colleagues suggest that this second case, *United States v. Blitch*, 773 F.3d 837 (7th Cir. 2014), *as amended on denial of reh'g and reh'g en banc* (Jan. 27, 2015), is helpful to their approach. I disagree, as it is difficult to imagine a more factually similar example of why an entrapment instruction is *not* required here.

Let's start with the facts of *Blitch*. There, as here, an ATF agent played the role of a disgruntled courier for a cartel and recruited a confidential informant to find individuals willing to rob a large quantity of drugs. *Id.* at 840. If anything, the informant's incentives were more of a problem in *Blitch* than they were here. That is because the *Blitch* informant had agreed, as part of a plea, to assist in the arrest and indictment of a specific number of individuals (ten), and he was applying the stash house robbery participants toward that quota. *Id.* Like Rock did here, the agent in *Blitch* offered

4

the defendants a way out if they had cold feet, but (as Dennis did) they remained enthusiastically committed. *Id.* at 842. And, as was true here, the informant in *Blitch* was actively involved in the sting. For instance, he asked one of the defendants to find another participant, discussed how the robbers would split the haul, set up a meeting with the undercover agent, and called the crew the night before the would-be heist to provide details. *Id.* at 840–42.

The panel in *Blitch* contrasted its facts with those in *Mayfield*. Whereas the latter involved a drawn-out courtship between the Government and a reluctant participant, *Blitch* featured a "take-it-or-leave-it proposition" where the Government merely presented a crime without extensively lobbying the defendants to participate. *Id.* at 845. The Court concluded that the defendants "were not subject to anything that would transform the government's solicitation into something more than an ordinary opportunity to commit a crime," and it rejected the argument that the "promise of obtaining a large amount of drugs, in addition to hundreds of thousands of dollars of actual cash on hand, qualifies as improper inducement." *Id.* at 844–45 (internal quotation marks omitted). Thus, far from helping the majority, *Blitch* rejects its reasoning.

Because there is not sufficient evidence of inducement, Dennis is not entitled to a jury instruction even if he could establish a lack of predisposition. *See Marino*, 868 F.2d at 551 n.3 ("Consequently, if the defendant does not produce sufficient evidence of inducement, his evidence of non-predisposition alone would not warrant an entrapment charge."). The threshold that a defendant must cross to get an instruction is not high, but Dennis has failed to meet his burden. I would therefore affirm the District Court's ruling on the entrapment instruction.

5

Dennis also raises a due process challenge. My determination that he was not entitled to an entrapment instruction does not foreclose concluding that the indictment should be quashed due to egregious conduct by the Government. *See, e.g.*, *United States v. Jannotti*, 673 F.2d 578, 608 (3d Cir. 1982) (*en banc*) (noting that "a finding of no entrapment does not preclude the availability of a due process defense"). As the majority notes, however, this claim falls short. I write nonetheless on this point to express my concern about the constitutional implications of stash house reverse stings.

The Government wields tremendous power in investigating crimes. Here it exercised that authority to create from whole cloth a fictitious crime and to prosecute someone for a robbery that could not have been committed. There was no stash house, no cartel, and no cocaine. This is not an isolated occurrence. According to a 2013 article, over 1,000 people have been arrested (and at least 600 have been prosecuted) in connection with attempting to rob fictitious stash houses. *See* Brad Heath, *ATF Uses Fake Drugs, Big Bucks to Snare Suspects*, USA Today, June 28, 2013, at 1A. The Constitution affords great deference to the Government's investigative choices, but it does draw a line: indictments based on outrageous conduct cannot stand. No court of appeals has found that the Government has crossed that line in setting up a stash house reverse sting. But it appears that the Government has been tiptoeing near the line.

For instance, in *United States v. Black*, 733 F.3d 294 (9th Cir. 2013), the Government sent an informant into "a bad part of town" to look for strangers willing to rob a stash house. *Id.* at 299 (internal quotation marks omitted). The targeting was not based on any suspicion that the people approached were in any way predisposed to commit the

6

crime. The majority concluded that there was not a due process violation. Judge Noonan dissented, writing:

> [T]he imaginary stash house . . . gives the government essentially unchecked power to increase the number of persons drawn in as robbers by supplying the number of imaginary guards for the drugs and by supplying the amount of imaginary drugs that are supposed to be present. The power exercised by the government is not only to orchestrate the crime but to control and expand those guilty of it. I do not see how this power can be rationally exercised. No standard exists to determine the limits of the government's discretion.

*Id.* at 318 (Noonan, J., dissenting). And when the Ninth Circuit declined to rehear the case *en banc*, Judge Reinhardt, joined by then-Chief Judge Kozinski, dissented. They wrote that the majority opinion sent "a dangerous signal that courts will uphold law enforcement tactics even though their threat to values of equality, fairness, and liberty is unmistakable." *United States v. Black*, 750 F.3d 1053, 1054 (9th Cir. 2014) (Reinhardt, J., dissenting from denial of rehearing *en banc*).

*Black* is a cautionary tale about what can result if the power to create crimes is employed without constraints. Our facts are not nearly as severe. The Government did not, as it did in *Black*, select a defendant at random. Rather, a confidential informant provided information about Dennis' criminal past, much of which the Government was able to corroborate, before the sting was approved. But that does not make the critique wholly inapplicable. Unlike Judge Noonan, I do not find it impossible for the Government to exercise its discretion rationally to set up stash house reverse stings. But I

7

share the concern that this practice, if not properly checked, eventually will find itself on the wrong side of the line.

Until then, courts can only play a limited role in policing investigative priorities. We are judges and not policymakers, and our lodestar is outrageousness and not imprudence. But what we can do is distinguish our narrow constitutional analysis from a broad stamp of approval. As we explained in an analogous context, "[t]his conclusion . . . should not be construed as an approval of the government's conduct. To the contrary, we have grave doubts about the propriety of such tactics. Although we cannot say that such conduct in and of itself violates the Constitution, it may illustrate the necessity for greater oversight so that questionable police practices can be curbed before they violate our most fundamental laws." *United States v. Beverly*, 723 F.2d 11, 13 (3d Cir. 1983). I echo these sentiments here.